**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

AISLYNN JENKINS,              )
                                    )
        Plaintiff,            )
                                    )
        vs.                 )        Civil A. No. 2:20-501
                                    )
SOUTHWESTERN PENNSYLVANIA    )
HUMAN SERVICES, INC.,          )
                                    )
        Defendant.       )

## MEMORANDUM OPINION

This multicount employment discrimination action principally stems from the decision by Defendant Southwestern Pennsylvania Human Services, Inc. ("SPHS"), the employer of Plaintiff Aislynn Jenkins ("Jenkins"), to reduce her from full-time to part-time status. Despite unrefuted evidence that financial constraints subsequently forced the closure of SPHS's Primary Care Program in which Jenkins worked, Jenkins maintains that SPHS used it as cover to discriminate against her. For the reasons explained in this opinion, however, Jenkins cannot prevail on her claims and SPHS is entitled to judgment in its favor.

## I.    Relevant Procedural History

Jenkins commenced this employment discrimination action in April 2021. (ECF No. 1.) In her Amended Complaint, she asserts claims against SPHS for retaliation and interference under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; sex discrimination under Title VII of the Civil Rights Act of 1964[1] ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and

---

[1] Jenkins' single count for Title VII discrimination appears to state claims both for gender discrimination and hostile work environment. (ECF No. 25.) The same is true for her claim for PHRA sex discrimination. The Court will address both types of claims in this opinion.

disability discrimination, disability retaliation, and sex discrimination under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. and Cons. Stat. Ann. § 951, *et seq.*  (ECF No. 43 ¶ 2.)

This matter proceeded through discovery.  The discovery deadline was extended twice, the second time over SPHS's objection.  (ECF Nos. 30; 32; 35.)  When Jenkins moved to extend the discovery deadline a third time in order to take several depositions, her motion was denied (ECF No. 35.)  Based upon the parties' submissions, the Court concluded that Jenkins failed to show good cause or offer any explanation why she had twice noticed and then canceled these depositions (*id.*)

Discovery is now closed, and SPHS has moved for summary judgment.  (ECF No. 39.) The matter has been fully briefed and is ripe for disposition.  (ECF Nos. 39-45; 48.)[2]

## II.    Relevant Factual Background[3]

In 2008, Jenkins began working as a Certified Physician Assistant ("PA-C") for SPHS's Primary Care Program.  (ECF No. 43 ¶ 5.)  As part of the onboarding process, she received an

---

[2] In its reply, SPHS moves to strike Jenkins' responsive brief arguing it was both untimely and filed without leave of court.  (ECF No. 44 at 1-2.)  Although best practice would have been to seek leave of Court, Jenkins states in her surreply that the delay was due to a power outage.  (ECF No. 48.)  Because Jenkins' responsive brief was only one day late, SPHS has sustained no undue prejudice.  (ECF Nos. 32; 42.)  Therefore, SPHS's motion is denied, and Jenkins' response and supporting exhibits will be considered as part of this Court's ruling.

[3] At the outset, the Court notes that Jenkins has referenced a number of "facts" in her responsive brief that are not supported in her responsive concise statement of material facts.  Her concise statement does not reference or support her allegations regarding her discussions with COO Kellie McKevitt (advising McKevitt that she would need to use FMLA leave to care for her daughter in July 2019) and with Human Resources Representative Cathy Martini (concerning Jenkins' desire to continue to use sick leave for FMLA leave).  Also absent from her concise statement is any factual support for her claims that she was never advised that her FMLA leave was approved, was told her hours were being watched, and that a nurse practitioner previously completed Jenkins' FMLA certification form. (ECF No. 42.)  By failing to do so, Jenkins has not complied with the requirements of Rule 56.  *See* LCvR 56.C.1 (requiring that a responsive concise statement of material facts include "any other material facts . . . the opposing party asserts are necessary for the

employee handbook.  (*Id.* ¶ 6.)  Throughout her tenure with the company, Jenkins primarily worked in Monessen, Pennsylvania, where she provided medical care and refilled prescriptions for underserved and vulnerable patients.  (ECF No. 41-5 at 2-3, 16.)

A year or two after she was hired, Jenkins requested intermittent FMLA leave.  (ECF No. 43 ¶ 9.)  She made the request at the encouragement of her daughter's physician because her daughter suffers from Juvenile Idiopathic Arthritis.  (ECF No. 41-5 at 6-7.)  Although Jenkins was approved for intermittent FMLA leave, she never used it.  (ECF No. 43 ¶ 10.)

By all accounts, her first three years with the Primary Care Program were uneventful, but things began to change in 2011.  After one of the doctors complained to Luther Sheets ("Sheets"), the then COO of SPHS, about safety issues in the office, Sheets singled Jenkins out as the person at fault.  (*Id.* ¶ 31; ECF No. 41-5 at 16.)  When Jenkins tried to explain it was not her mistake, Sheets continued to berate and "t[ake] his frustrations out on [her]."  (ECF No. 41-5 at 16.)

Jenkins never had a positive interaction with Sheets after this confrontation.  (ECF No. 43-4 at 22.)  Instead, every time she saw him, which was limited to once or twice a year, he would find a way to demean her.  (*Id.*)  When asked to provide specifics during her deposition, Jenkins explained that on a few occasions he called her "kiddo" or "honey," which he never used to address male employees.  (ECF No. 43-4 at 26-27.)

In 2013, Raelynn Jackson ("Jackson") was hired as the office manager.  (ECF No. 41-5 at 12.)  Jackson was not Jenkins' supervisor and was below her in the chain of command.  (ECF Nos.

---

[c]ourt to determine the motion for summary judgment").  Moreover, after a review of the entire record (including Jenkins' affidavit), the Court has been unable to locate any evidence that supports these bald allegations.  Plaintiff cannot simply rely on her own sweeping and unsupported assertions to create a genuine issue of material fact on summary judgment.  *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  As such, the Court cannot consider her unsupported assertions as part of its analysis.

41-5 at 17; 43 ¶¶ 7-8.)  Nevertheless, shortly after she was hired, Jackson began ordering Jenkins to perform clerical duties.  (ECF No. 43 ¶¶ 23-24.)  As a result, it suddenly became Jenkins' responsibility to order supplies and occasionally pick up Jackson's laundry.  (*Id.* ¶ 24.)

At some point, Jenkins decided to inform Jackson that there were certain things she was doing incorrectly.  (ECF No. 41-5 at 14.)  Instead of being receptive to Jenkins, Jackson responded by retaliating against her.[4]  (*Id.*)  She began scheduling Jenkins to work shifts that would make it impossible for her to attend meetings.  (*Id.* at 13-14.)  Jackson also would throw shoes at the wall, slam doors, belittle Jenkins, remove developmental screens to reduce Jenkins' quality scores, and even kicked her out of her office.  (ECF No. 41-5 at 4-5.)

Four years later, Jackson started a rumor about Jenkins.  (ECF Nos. 43 ¶ 32; 45-2 at 10.) She began telling anyone who would listen that Jenkins was the reason for the Primary Care Program's continual turnover.  (*Id.*)  According to Jackson, the turnover was the result of Jenkins' incompetence, which was so egregious that no doctors, nurse practitioners, or other staffers stayed at the Primary Care Program for more than a year or two.  (*Id.*; ECF No. 41-5 at 12, 16.)

Sometime in 2017, Jenkins complained to Sheets that Jackson was mismanaging the office. (ECF Nos. 43 ¶ 33; 43-4 at 19.)  During this conversation, Jenkins also raised concerns that she was the "only full-time provider" for 5,000 patients.  (ECF No. 41-5 at 19-20.)  Instead of being receptive to her concerns, Sheets responded by becoming "aggressive [and] accusatory."  (ECF

---

[4] Throughout her time at the Primary Care Program, Jenkins was excluded from quality meetings, staff meetings, and new hire meetings.  Jenkins surmised this was the result of continued retaliatory behavior by Jackson, who was responsible for scheduling.  (ECF No. 43 ¶ 26).  During quality meetings, providers learn how they are being rated. (ECF No. 43-4 at 6-7.)  Jenkins was able to participate in at least one of these meetings.  (*Id.* ¶ 25; ECF No. 43-4 at 7.)  Jenkins was not invited to any staff meetings.  (ECF No. 43 ¶ 26.)  The only hiring meeting in which Jenkins was able to participate was the one that resulted in Julia Disanti ("Disanti") being hired.  (ECF Nos. 41-5 at 14; 43 ¶ 35.)  It bears mentioning that this hiring meeting was held shortly after Jackson was hired and before Jenkins' relationship with Jackson deteriorated.  (*Id.*)

No. 45-2 at 11.)  The meeting ultimately resulted in Sheets informing Jenkins that Jackson was doing a "good job" and later ignoring any complaints that Jenkins brought to him.  (ECF Nos. 43 ¶ 33; 43-4 at 21.)

In October 2018, at her doctor's encouragement, Jenkins requested FMLA leave based on anxiety.[5]  (ECF No. 43 ¶ 11.)  Her request for intermittent FMLA leave was granted in November 2018, and she was permitted to reduce her work schedule to three days per week.  (*Id.* ¶ 12.)  This is the only accommodation Jenkins ever requested.  (ECF No. 41-5 at 23.)

Three months later, Jenkins was asked to recertify her medical condition.  (ECF No. 43 ¶ 3.)  A letter sent to her by SPHS's Human Resources Director Matthew Keranko stated:

> According to your intermittent Family Medical Absence beginning November 27, 2018, and the Doctor's excuse, it is our understanding that your work hours were to be reduced to three (3) days per week.  Since November 27, 2018, there have only been two (2) occasions which you worked the required three (3) days per week.
> Therefore, because of the change in circumstances and in accordance with the FMLA, we are asking for a recertification of your medical condition.

(ECF No. 41-6.)

Jenkins disputes the facts underpinning this letter.  (ECF No. 43-4 at 2.)  She claims that she was, in fact, working the required three days per week.  (ECF No. 41-5 at 7.)  Nonetheless, given the letter's tone, she decided to complete the recertification process.  (*Id.*)

On February 28, 2019, Jenkins submitted her recertification, which was completed by a nurse practitioner.  (ECF No. 43 ¶ 14.)  A week later, Jenkins was advised that her recertification was deficient as it was not signed by a physician as required by SPHS's employee handbook.  (*Id.* ¶¶ 15-16; ECF No. 41-7.)  Jenkins ultimately submitted the corrected request for recertification on March 27, 2019.  (ECF No. 43 ¶ 18.)

---

[5] Jackson went on medical leave in 2018.  (ECF No. 43 ¶ 34.)

Even though company policy did not permit Jenkins to take paid sick leave since her FMLA was not recertified, she continued to take her days off as needed and continued to collect paid sick leave and salary.  (*Id.* ¶ 19.)  Further, while she was awaiting recertification, Jenkins never missed a paycheck although she testified in her deposition that there was some confusion as to whether she would be paid.  (ECF Nos. 41-5 at 22; 43-4 at 31-32.)  This uncertainty caused her an immense amount of stress.  (*Id.*)

On March 29, 2019, Jenkins was informed that she was being reduced to part time status due to budgetary conditions.  (ECF No. 43 ¶ 38.)  Along with six other staff members including Alissa Madison, a medical assistant; Denise Hutchinson, a medical assistant; Nancy Mastick, a medical assistant; Carley Layhue, a Licensed Practical Nurse; Kara Land, a medical assistant; and Disanti, a nurse practitioner, Jenkins was reduced to part time on April 15, 2019.  (*Id.* ¶¶ 21, 39-40; ECF No. 41-5 at 5-6.)  All of the staff who were reduced to part time lost their sick and vacation leave as well as their health benefits.  (ECF Nos. 41-11; 43 ¶ 42.)  In order to avoid this reduction, Jenkins requested that she be transferred to a different department.  (ECF No. 43-4 at 38.)  Her request was denied.  (*Id.*)  The one opening for which she asserts she was qualified was given to Dr. Zelonis.[6]  (*Id.*)

Less than two months later, on May 13, 2019, Jenkins resigned.  (ECF Nos. 41-13; 43 ¶ 43.)  In her resignation letter, she informed SPHS that she had decided to leave for a position in a "thriving pediatric practice" and thanked SPHS for the opportunity she had been given.  (ECF No.

---

[6] Little can be gleaned from the record about Dr. Zelonis, the position for which he was hired, or his credentials, other than the fact he was a physician and not a PA-C like Jenkins.  While not in the record, SPHS represents that the position for which he was hired was part time rather than full time.  (ECF No. 50 at 9.)  Jenkins was already placed in a part-time position and was seeking a full-time position. Indeed, it is not even clear from the record what the proper spelling of his last name is.  The Court will use SPHS's spelling of the doctor's name.

43 ¶ 43.)  At the time she gave her notice, she was aware that the Primary Care Program was in dire financial straits and was, in effect, a "sinking ship."  (*Id.* ¶ 37.)  The only remaining full time providers were two doctors, Drs. Lukasewicz and Proddutur.  (ECF No. 41 at 11.)

In October of that year, SPHS's Board voted to close the Primary Care Program.  (ECF No. 41-14 at 5-9.)  The space was repurposed and turned into a suboxone clinic.  (ECF No. 41-5 at 3.)  Thus, although the Primary Care Program no longer exists, SPHS remains in operation.  (ECF Nos. 43 ¶ 44; 43-2.)

While working for the Primary Care Program, both Jenkins and Disanti, a nurse practitioner, performed clerical tasks that some male providers refused to perform, including writing school notes, signing driver's license forms, and reviewing labs as well as x-rays. (ECF Nos. 41-5 at 11; 43 ¶ 21; 43-4 at 4.)  The only male provider identified by Jenkins as having refused to perform these tasks is Dr. Lukasewicz.  (ECF Nos. 41-5 at 11; 43 ¶ 22.)  In contrast, Dr. Sanketh Proddutur performed his own clerical work and assisted Jenkins and Disanti.  (ECF No. 43 ¶ 22.)  Jenkins posits that clerical tasks often fell to her "[b]ecause [she] had been there so long [and] knew how the office ran."  (ECF No. 43-4 at 5.)

Jenkins also asserts that doctors in her group were paid more than her despite doing less work.  (ECF No. 43-4 at 15.)  Unlike her, they also were provided with new furniture.  (ECF No. 41-5 at 15.)  Furthermore, Jenkins was forced to relinquish her office to Dr. Proddutur shortly after he was hired.  (ECF No. 43 ¶ 28.)  Because no other offices were available, Jenkins moved her desk into the same area as Disanti.  (*Id.*)  None of the staff had their own offices.  (*Id.* ¶ 41.)

Jenkins further complains that she had to see more patients than some of the doctors.  Jenkins, like Dr. Proddutur, was expected to see a patient every fifteen minutes.  (*Id.* ¶ 29; ECF

No. 43-4 at 11.)  Some doctors, including Dr. Peter McCarthy and Dr. Lukasewicz, were only

required to see a patient every thirty minutes. (ECF No. 43-4 at 10.)

In response to SPHS's motion for summary judgment, Jenkins submitted an affidavit that

reads as follows:

> I was the only female provider to lose my full-time job and benefits.  I had a meeting
> with Tracy Osman (practice manager) and told her that I would work anywhere in
> the company to keep my job and would relinquish my much-needed FMLA and go
> back to work full-time effective immediately.  I explained to her in detail in that
> meeting that I have an XDEA and [am] also trained to work force.  I had one
> hundred slots at that time, soon to be[ ]275 on license for Sub Oxone patients.
>
> I also explained that in detail in an open meeting in Rita Nichols['] office.  In
> attendance at that meeting were me, Luther Sheets, Tracy Osman, Kelly McKevitts,
> Dr. [Scott] Cook, and other [Center of Excellence] staff and medical staff.
>
> I could have worked [Center of Excellence] and mental health side since they
> close[d] primary care.
>
> These meetings were met with zero follow-up and shortly after[,] I learn[ed] that
> Dr. Zelonis would be coming on.[7]

(ECF Nos. 41 ¶ 8; 43-5.)

## III.    Standard of Review

The Federal Rules of Civil Procedure provide that summary judgment must be granted if

there are no genuine issues of material fact and the movant is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce

facts sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of

a genuine issue of material fact.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S.

---

[7] SPHS argues that this affidavit should be stricken because it is a sham affidavit.  As discussed in Section IV, the Court disagrees.

574, 586-87 (1986).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Id.* at 587.  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."  *Nat'l State Bank v. Fed. Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor.  *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

## IV.    Discussion

Jenkins has asserted ten claims against SPHS, each of which will be addressed in turn. As discussed herein, SPHS is entitled to judgment in its favor with respect to all of Jenkins' claims.

### A.    FMLA Retaliation Claim

Jenkins has asserted a FMLA retaliation claim against SPHS. As discussed below, the Court concludes that a reasonable jury could not find that Jenkins has demonstrated a prima facie case of retaliation or that she rebutted SPHS's legitimate nondiscriminatory reason for reducing her to part time.

Here, because the parties agree that there is no direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies. (ECF Nos. 40; 42.) *See Lichtenstein v. Univ. of*

*Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) ("claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276-77 (1989) (O'Connor, J., concurring)"); *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014).

To prove a prima facie claim for retaliation, Jenkins must establish that "(1) [s]he invoked [her] right to FMLA-qualifying leave, (2) [s]he suffered an adverse employment decision, and (3) the adverse action was causally related to [her] invocation of rights." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152 n.6 (3d Cir. 2017). Once the plaintiff meets her burden, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for its decision. *See Lichtenstein*, 691 F.3d at 302. If the defendant meets this burden, the plaintiff then must point to some evidence, direct or circumstantial, from which a reasonable factfinder could disbelieve the defendant's articulated legitimate reason is mere pretext. *See id.*

In the case sub judice, the parties first dispute whether there is evidence in the record from which a reasonable juror could find that Jenkins established a prima facie case of FMLA retaliation. There are a variety of ways a plaintiff can satisfy the causality prong, but the two main ways are (1) unduly suggestive temporal proximity between the invocation of FMLA rights and the adverse action, or providing (2) "circumstantial evidence of a 'pattern of antagonism' following the protected conduct." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000); *Kissinger v. Mennonite Home*, Civ. A. No. 20-3000, 2021 WL 5356801, at *13-*14 (E.D. Pa. Nov. 17, 2021).

Concerning the issue of temporal proximity, the United States Court of Appeals for the Third Circuit has explained that temporal proximity can be found where days and not months have passed between when the employee invoked the protections of the FMLA and the employer's retaliatory act. *Branch v. Temple Univ.*, __ F. Supp. 3d __, 2021 WL 3562851 (E.D. Pa. Aug. 12, 2021). Generally speaking, a "period of 'greater than ten days' is not unusually suggestive on its own and 'requires supplementary evidence of retaliatory motive.'" *Kissinger*, 2021 WL 5356801, at *13 (quoting *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014)).

Jenkins identifies two retaliatory acts: (1) the decision to reduce her from full-time to part-time status and (2) the decision to hire a doctor for an open position in a different department. (ECF No. 42 at 6-7.) As to the latter, to the extent Jenkins suggests that SPHS was required to hire her for a different department, Jenkins failed to develop this argument or elicit any evidence from which a reasonable factfinder could find in her favor on this issue. Rather, she merely asserts that there was an open position in another department for which she was qualified that ultimately went to a physician, Dr. Zelonis. Furthermore, Jenkins has failed to offer any support for her apparent theory that SPHS had a legal duty to hire her for a different position or continue to employ her upon the closure of the Primary Care Program where she worked.

Jenkins' argument concerning SPHS's decision to reduce her from full-time to part-time is equally unavailing. Jenkins requested intermittent FMLA leave in October 2018. She was approved in November 2018. The decision to reduce her to part-time status was not made until March 29, 2019, some five months later. *See Hernandez v. Temple Univ Hosp.*, Civ. A. No. 17-4381, 2019 WL 130508, at *8 (E.D. Pa. Jan. 8, 2019) (explaining the relevant date for determining proximity is the date the plaintiff invokes the protections of the FMLA). Even assuming that the relevant date for purposes of this analysis is the date that Jenkins submitted her request to recertify

11

her FMLA leave, this was still a month prior to the decision to move her to part-time status. *But see Hernandez*, 2019 WL 130508, at *8 ("When the employee has made multiple requests for FMLA leave or a request for intermittent leave, courts look to the last application for FMLA leave or to the last instance in which the worker engaged in the protected activity of taking FMLA leave"). Therefore, without further evidence, the temporal proximity between Jenkins' last protected activity and her termination is not sufficient for a finding of discriminatory animus.

Where the temporal proximity is not unduly suggestive, courts may still infer causation if the plaintiff shows evidence that the defendant "engaged in a pattern of antagonism in the intervening period." *Branch*, 2021 WL 3562851, at *16 (quoting *Capps*, 147 F. Supp. 3d at 337). Where an employer has approved all FMLA requests prior to the one at issue, courts have consistently held an action for retaliation does not lie. *See Wilson v. Aerotek, Inc.*, 854 F. App'x, 430, 433-34 (3d Cir. 2021). *Niven-Himes v. Pa. Hosp. of the Univ. of Pa. Health Sys.*, Civ. A. No. 2:20-cv-00558, 2021 WL 5298982, at *7 (E.D. Pa. Nov. 15, 2021) (finding no retaliatory animus where "[p]laintiff had taken six prior FMLA leaves since 2007 without incident, with [d]efendants approving each of those requests").

Here, Jenkins first requested and was approved for intermittent FMLA leave in 2008 to take care of her daughter. In 2018, when Jenkins sought intermittent FMLA leave for her anxiety; it was also approved. Contrary to Jenkins' representations to the Court, there is nothing *in the record* that supports her claim she received negative comments about using FMLA intermittent leave. *See Krohmer v. Am. Airlines, Inc.*, Civ. A. No. 2:17-cv-01239, 2021 WL 3828150, at *5 (W.D. Pa. Aug. 27, 2021). Additionally, there is no evidence that Jenkins' invocation of her FMLA rights was weighed as part of the decision to hire Dr. Zelonis. Simply put, considering all

of the evidence before the Court, a reasonable jury could not find a pattern of antagonism. Therefore, Jenkins cannot establish a prima facie case of FMLA retaliation.

Jenkins has also failed to demonstrate that SPHS's reason for moving Jenkins from full time to part time represents or is evidence of pretext.  To establish pretext, she "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [SPHS's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the employer did not act for the asserted non-discriminatory reasons. *Lichtenstein*, 691 F.3d at 310 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  Thus, a plaintiff must show more than "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  In cases where "the temporal proximity is not so close as to be unduly suggestive" of causation, the trial court may examine "timing plus other evidence. . . ." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3d Cir. 2003)).

Where "plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues." *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) (internal citation and quotation omitted). Despite submitting a response in opposition and a surreply, Jenkins failed to address the issue of pretext or otherwise attempt to rebut SPHS's legitimate nondiscriminatory reason.  Thus, as her failure to do so could be construed as her intent to abandon each of her claims premised on the *McDonnell Douglas* burden-shifting framework, the Court's analysis could end here.

Regardless, the Court finds that based on the undisputed evidence of record, no reasonable factfinder could conclude that the defendant's articulated legitimate reason is mere pretext. SPHS's stated reason for moving Jenkins from full time to part time was financial hardship. Six other employees were similarly affected. Consistent with its stated reason, SPHS's board voted to close the Primary Care Program seven months later. As a result, every position at the Primary Care Program was eliminated. There are no inconsistencies and implausiblities in this scenario because it is undisputed that SPHS was a severely financially distressed entity and made a decision to eliminate the program for financial reasons.

Jenkins attempts to avoid summary judgment by relying on the statement in her affidavit that she "was the only female provider to lose [her] full-time job and benefits." [8] Although Jenkins describes herself as a "provider" and appears to suggest that as a "provider" she should have been treated differently, she does not offer any evidence or otherwise articulate her definition of what constituted a "provider" at the Primary Care Program. Six other employees in the Primary Care Program in addition to Jenkins who also lost their benefits and were reduced to part-time status at the same time. Jenkins has offered no evidence or argument explaining why she should have been treated differently from the other staff members, including a nurse practitioner and a licensed practical nurse, who also provided medical care to patients. Moreover, while two physicians retained full time status, Jenkins also fails to explain why her position was equivalent to these physicians.

---

[8] SPHS argues that Jenkins' statement that she was the only female provider reduced to part-time status is inconsistent with her deposition testimony in which she agreed that other SPHS employees were reduced to part time. (ECF No. 44 at 2.) For this reason, SPHS contends that her affidavit is a sham affidavit and should be stricken. Despite submitting a surreply, Jenkins failed to respond to this argument. Upon review of the affidavit and her testimony, the Court declines to apply the sham affidavit doctrine. For the sham affidavit doctrine to be applicable, the subsequent sworn statement in the affidavit needs to be irreconcilably inconsistent with the prior testimony. *See Samuel v. Target Realty*, Civ. A. No. 19-2203, 2021 WL 4774858, at *9 n.8 (E.D. Pa. Oct. 13, 2021) (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)). This is not the case here given the ambiguity regarding what Jenkins means by "provider."

Moreover, Jenkins' apparent implication that because she utilized FMLA leave she should have been the sole survivor of this financial hardship or transferred to a different department is patently unsupportable.  Further, as already stated, the one position that she purports to have been qualified for was filled by a doctor, Dr. Zelonis.  Jenkins has not articulated why he is a comparator.

Based on the record before the Court, there are no genuine issues of material fact that would support a finding that SPHS's stated reason was pretextual.  Thus, SPHS is entitled to summary judgment in its favor on Jenkins' FMLA retaliation claim.

B.     FMLA Interference Claim

Similarly, Jenkins has not put forth any evidence from which a reasonable jury could find that she was denied benefits to which she was entitled.  "Because [an] FMLA interference claim does not concern discrimination, a *McDonnell Douglas* burden-shifting analysis is not required." *Branch*, 2021 WL 3562851, at *13 (citing *Sommer v. Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006)).  Consequently, "[u]nlike an FMLA retaliation claim, '[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.'"  *Capps*, 847 F.3d at 155 (quoting *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005)).

"The Third Circuit has established that 'when employees invoke grants under the FMLA, employers may not 'interfere with, restrain, or deny the exercise of or attempt to exercise these rights.'  Nor may employers 'discharge or in any other manner discriminate against an individual for opposing any practice made unlawful.'"  *Branch*, 2021 WL 3562851, at *13 (quoting *Lichtenstein*, 691 F.3d at 301).  To establish an FMLA interference claim, a plaintiff must demonstrate:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to

> FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to
> take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was
> entitled under the FMLA.

*Capps*, 847 F.3d at 155 (quoting *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014)).

SPHS challenges Jenkins' ability to meet the fifth element of a claim for FMLA interference.  Jenkins counters that not only did SPHS interfere with her FMLA rights by reducing her hours to part time and taking away her unused sick leave, it also refused to transfer her to a different SPHS entity when it became clear the Primary Care Program was financially distressed.

In determining if summary judgment is warranted on Jenkins' interference claim, the Court is mindful of the Code of Federal Regulations, which provides in relevant part as follows:

> The employer may also transfer the employee to a part-time job with the same
> hourly rate of pay and benefits, provided the employee is not required to take more
> leave than is medically necessary.  For example, an employee desiring to take leave
> in increments of four hours per day could be transferred to a half-time job, or could
> remain in the employee's same job on a part-time schedule, paying the same hourly
> rate as the employee's previous job and enjoying the same benefits.  The employer
> may not eliminate benefits which otherwise would not be provided to part-time
> employees; however, an employer may proportionately reduce benefits such as
> vacation leave where an employer's normal practice is to base such benefits on the
> number of hours worked.

29 C.F.R. § 825.204(c).  However, this regulation does not eliminate Jenkins' burden to demonstrate that FMLA benefits *were actually withheld*. *See Capps*, 847 F.3d at 156.  She has not done so; indeed, Jenkins has admitted that no benefits were ever withheld.[9]

Furthermore, to assert an interference claim an employee must show that the employer *illegitimately* prevented her from receiving benefits.  *Reagan v. Centre LifeLink Emergency Med. Servs., Inc.*, 774 F. App'x 82, 84 (3d Cir. 2019).  Here, Jenkins was one of seven people moved to

---

[9] Jenkins' position that an FMLA violation occurred because she lost her sick leave is unsupported by the case law.  Instead, the case law is clear that "[t]he FMLA does not protect an employee who seeks to take advantage of additional leave not covered by the FMLA." *Tighe v. Arconic Inc.*, Civ. A. No. 19-2185, 2021 WL 2177508, at *6 (D. N.J. May 28, 2021).

part time status before SPHS's financial decision to close the Primary Care Program six months later.  Despite having had sufficient time and opportunity to conduct discovery, Jenkins presented no evidence that the decision to move her, and other employees, to part time was related to her FMLA request or part of a scheme to force her to resign.  *See Spring v. Sealed Air. Corp.*, 483 F. App'x 765, 769 (3d Cir. 2012) ("Because a plaintiff will not prevail on an interference claim if the defendant can establish that it terminated the plaintiff for a reason unrelated to his intention to exercise his rights under the FMLA, . . .  the [d]istrict [c]ourt was correct to grant summary judgment [plaintiff]'s interference claim").  There is also no evidence of record that her use of FMLA leave was the reason a doctor was hired over Jenkins.

Finally, as the Third Circuit recently reiterated in *Watson v. Department of Revenue*, where an interference claim is duplicative of a retaliation claim that failed because a plaintiff could not establish causation, summary judgment should also be granted on the interference claim.  *Watson v. Pa., Dep't of Rev.*, 854 F. App'x 440 (3d Cir. 2021) (citing *Lichtenstein*, 691 F.3d at 312).  Here, the factual predicate for Jenkins' FMLA interference claim is identical to that of her unsupported retaliation claim.

Because Jenkins has failed to create a genuine issue of material fact as to her claim that SPHS interfered with her rights under the FMLA, summary judgment in favor of SPHS will be granted.

C.      ADA and PHRA Disability Discrimination Claims[10]

Summary judgment in favor of SPHS is also warranted on Jenkins' ADA and PHRA disability discrimination claims.  Courts apply the *McDonnell Douglas* burden-shifting framework

---

[10] Jenkins has conceded that she was given all accommodations for which she was entitled.  (ECF No. 41-5 at 23.)  Thus, a claim for failure to accommodate does not lie. *See Niven-Himes*, 2021 WL 5298982, at *3-*4.

for ADA and PHRA discrimination claims where there is no direct evidence of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (applying *McDonnell Douglas* to ADA discrimination claims); *Fromm v. MVM, Inc.*, 371 F. App'x 263, 269 n.3 (3d Cir. 2010) ("the ADA and PHRA are interpreted coextensively").

SPHS argues that Jenkins cannot establish a prima facie case because the reason she was moved to part time was due to SPHS's financial difficulties. SPHS also asserts she cannot demonstrate pretext. (ECF Nos. 40; 44.)

To make out a prima facie case of workplace disability discrimination a plaintiff must establish: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) she was subject to an adverse employment action under circumstances that raise an inference of discriminatory action. *Sulima*, 602 F.3d at 185. Jenkins maintains that she suffered an adverse action. (ECF No. 42 at 9.) For purposes of its motion, SPHS appears to concede that element. At the same time, however, Jenkins has not put forth any evidence to support a claim that she was subject to an adverse employment action under circumstances that raise an inference of discriminatory action. This element requires a "causal nexus between [the] disability" and the adverse employment action. *See Drummer v. Trustees of Univ. of Pa.*, 286 F. Supp. 3d 674, 683 (E.D. Pa. 2017). As previously stated in Section IV(A), there is no evidence in the record from which a reasonable jury could find temporal proximity as months, not days, are at issue. *See Gorman v. Acteon Networks*, Civ. A. No. 19-5818, 2021 WL 2156359, at *6 (E.D. Pa. May 26, 2021). The Court incorporates that analysis here.

Jenkins likewise has not offered comparative evidence. *Mullen v. Wells Fargo Bank, N.A.*, Civ. A. No. 19-3995, 2021 WL 4453604, at *5 (E.D. Pa. Sept. 29, 2021) (quoting *Greene v. V.I.*

*Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)).  It is patently obvious that doctors and PA-Cs are not identical positions.  *See Ellis v. Bank of NY Mellon Corp.*, 837 F. App'x 940, 942 (3d Cir. 2021) (quoting "it is [plaintiff's] burden, not [employer]'s, to dispel this possibility and establish that the purported comparators are, in fact, comparable").  Furthermore, as already discussed, there is absolutely no evidence that Jenkins' disability or use of FMLA leave factored into SPHS's decisions to reduce her to part time and to hire a doctor for an opening instead of her.  In summation, there is insufficient evidence from which a jury could reasonably conclude that there was a causal relationship between the adverse actions and the disclosure of her disability and/or use of her FMLA leave.

The Court's review of the record also demonstrates the absence of any evidence of pretext.  To establish pretext, a plaintiff must offer evidence from which a reasonable jury could "(1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fowler v. AT & T*, __ F.4th __, 2021 WL 5540844, at *4 (3d Cir. Nov. 26, 2021).

As discussed in the context of Jenkins' FMLA retaliation claim, there is no evidence in the record that would permit a juror to disbelieve SPHS's explanation for reducing Jenkins from full to part time.  Said differently, Jenkins has offered no evidence from which a reasonable factfinder could conclude that her anxiety or use of FMLA leave was the "but for" reason for her reduction to part time.  Instead, it is undisputed that Jenkins was one of seven employees reduced to part time as a result of her employer's financially distressed condition.  There is also nothing in the record to suggest that any of the other six were on FMLA leave or were disabled within the meaning of the ADA.

Adding further credence to SPHS's legitimate nondiscriminatory reason is that shortly after the seven employees were reduced to part time status, the Primary Care Program closed, thereby eliminating every job in the program.  For these reasons, Jenkins has not provided evidence from which a factfinder could infer that SPHS's neutral reason for the decision to reduce her from full time to part time was pretextual.  *See Mascarenhas v. Rutgers*, 814 F. App'x 698, 700 (3d Cir. 2020) (a purportedly wrong or mistaken decision is not sufficient to rebut a legitimate non-discriminatory reason).

Moreover, Jenkins has cited no case law for her contention that under existing law, SPHS was required to create a new position in a different department. As already stated, the one position that she purports to have been qualified for was filled by a doctor and Jenkins has not articulated how she is "similarly situated" to Dr. Zelonis.

For these reasons, Jenkins' ADA and PHRA disability discrimination claims fail as a matter of law, and summary judgment in favor of SPHS will be granted.

D.     ADA and PHRA Disability Retaliation Claims

The *McDonnell Douglas* burden-shifting framework also applies to ADA and PHRA disability retaliation claims.  *Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 60 (3d Cir. 2019) (applying *McDonnell Douglas* to an ADA retaliation claim); *Berardinucci v. Temple Univ.*, Civ. A. No. 18-4193, 2020 WL 4201521, at *6 (E.D. Pa. Dec. 27, 2020) (applying *McDonnell Douglas* to a PHRA claim).

SPHS asserts that it is entitled to summary judgment on Jenkins' ADA and PHRA disability retaliation claims because Jenkins cannot demonstrate a prima facie case of retaliation or show pretext.  (ECF Nos. 40; 44.)  Jenkins failed to respond to this argument.  (ECF No. 42.)

Despite Jenkins' failure to do so, the Court will nonetheless analyze the merits of her disability retaliation claims.

To demonstrate a prima facie case of retaliation, a plaintiff "must provide evidence of "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."" *Belles v. Wilkes-Barre Area Sch. Dist.*, 843 F. App'x 437, 439 (3d Cir. 2021) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). "[C]ourts look to the same evidence of causation for an FMLA retaliation case as they do for an ADA retaliation case." *Berardinucci*, 2020 WL 4201521, at *2 (citing *Lichtenstein*, 691 F.3d at 307). As discussed previously in Section IV(A) with respect to Jenkins' FMLA retaliation claim, Jenkins has offered no evidence from which a reasonable factfinder could conclude a causal connection exists between her protected activity and the adverse actions. The Court incorporates that analysis herein.

Turning to the question of pretext, as already stated, Jenkins has not rebutted SPHS's legitimate nondiscriminatory reason for reducing her to part time. *See Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 65 (3d Cir. 2019) ("To prove causation at the pretext stage for an ADA or PHRA retaliation claim, the plaintiff must show that her protected activity was the 'but-for' cause of the adverse employment action"). *See also Elms v. W. Chester Borough*, Civ. A. No. 21-279, 2021 WL 5003332, at *3 (E.D. Pa. Oct. 28, 2021) ("Because the evidence concerning a legitimate nondiscriminatory reason and pretext is the same for the disparate treatment and retaliation claims, the Court addresses them together"). Again, the Court incorporates by reference its analysis in Section IV(D).

For these reasons, Jenkins' ADA and PHRA retaliation claims fail, entitling SPHS to judgment in its favor.

E.   Title VII and PHRA Sex Discrimination Claims

Jenkins' Title VII and PHRA sex discrimination claims are likewise unavailing.  Title VII and PHRA sex discrimination claims are also analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Hatch v. Franklin Cty.*, 755 F. App'x 194, 200 (3d Cir. 2018).  In its motion for summary judgment, SPHS contends that Jenkins cannot establish that an adverse employment action occurred under circumstances that give rise to an inference of discrimination or that its legitimate nondiscriminatory reasons are pretextual.  (ECF Nos. 40; 44.)  Seemingly realizing the weaknesses of this claim, Jenkins' responsive brief consists of only two sentences: "Plaintiff has alleged that she was the only female-full time employee to be reduced to part-time. This satisfies her prima facie case of discrimination under Title VII."  (ECF No. 42 at 11.)

To establish a prima facie case of disparate treatment, a plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination.  *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020); *Anderson v. Mercer Cty. Sheriff Dep't*, 815 F. App'x 664, 666 (3d Cir. 2020).  Here, SPHS does not dispute that Jenkins is a member of a protected class, that she is qualified for her position, or that she suffered an adverse action (ECF No. 40).  Therefore, the Court need only address the fourth prong.

There are two ways to satisfy the fourth element: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial

evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Drummer v. Hosp. of Univ. of Pa.*, 455 F. Supp. 3d 160, 168 (E.D. Pa. 2020) (quoting *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)); *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268-69 (3d Cir. 2010) (stating "comparative evidence is often highly probaive of discrimination, [but] it is not an essential element of a plaintiff's case").

Jenkins has not met her burden using comparative evidence because she has not identified a comparator similarly situated to her in all respects. *See In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018); *see Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (explaining "[t]he plaintiff has the burden of demonstrating that similarly situated persons were treated differently"). Although "'similarly situated' does not mean 'identically situated,' a plaintiff must [still] demonstrate that she is similar to the alleged comparator in relevant respects." *Jackson v. PNC Bank*, Civ. A. No. 15-230, 2016 WL 7324595, at *6 (W.D. Pa. Dec. 16, 2016). During her deposition, Jenkins identified (albeit implicitly) two male doctors as possible comparators who were treated differently. Jenkins has not proffered any evidence or offered any argument as to why these doctors are proper comparators. Simply claiming that someone is a possible comparator without any supporting evidence is not sufficient to withstand summary judgment.

Additionally, a reasonable factfinder also could not conclude there was a causal nexus between membership in a protected class and the adverse employment action. Jenkins was one of seven employees who were reduced from full time to part time status which occurred just months before the Primary Care Program ultimately closed. Although two male doctors remained full time until the program's closure, as already stated, they are not similarly situated. Furthermore,

there is nothing in the record to suggest that this decision was gender based, and despite having the opportunity to conduct discovery to determine SPHS's rationale, Jenkins has offered no evidence to establish a causal nexus.

Jenkins likewise has failed to meet her burden to demonstrate pretext. Faced with financial hardship, SPHS made the decision to reduce staff from full to part time. As already stated, it is uncontroverted that this was not a ruse as the Primary Care Program ceased operations just six months later. There is no evidence in the record that even suggests, let alone creates an issue of fact, that these decisions were gender based. Summary judgment, thus, will be granted on Jenkins' sex discrimination claims.

F.      Title VII and PHRA Hostile Work Environment Claims

The Court further concludes that a reasonable jury could not find that SPHS's actions rise to the level of a hostile work environment. To succeed on a hostile work environment claim, a plaintiff must demonstrate that (1) she suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for respondeat superior liability is present. *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020)). *See Szyper v. Am. Med. Response Mid-Atlantic, Inc.*, Civ. A. No. 20-4642, 2021 WL 5711826, at *3 (E.D. Pa. Dec. 1. 2021) (applying the same standard in a PHRA claim). "Whether an environment is hostile requires looking at the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017)

(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).   SPHS challenges the second element.

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment." *Komis v. Sec'y of U.S. Dept. of Labor*, 918 F.3d 289, 293-94 (3d Cir. 2019).   Furthermore, "[t]he Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment,' and that '[t]he standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.'"   *Donahue-Cavlovic v. Borough of Baldwin*, Civ. A. No. 2:15-cv-1649, 2017 WL 4862072, at *7 (W.D. Pa. Oct. 26, 2017) (quoting *Obergantschnig v. Saw Creek Estates Comm. Ass'n, Inc.*, Civ. A. No. 12-cv-5911, 2013 WL 5676328, at *4 (E.D. Pa. Oct. 18, 2013)).

As a result, "the ordinary tribulations of the workplace," "such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" cannot evidence a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) ("The Supreme Court has stated that Title VII is not violated by the mere utterance of an [ ] epithet which engenders offensive feelings in an employee or by mere discourtesy or rudeness, unless so severe or pervasive as to constitute an objective change in the conditions of employment") (internal quotation marks omitted)).   Instead, a hostile work environment claim requires conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person

would find hostile or abusive[.]" *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 96 (3d Cir. 2020) (quoting *Harris*, 510 U.S. at 21).

In support of her hostile workplace claim, Jenkins lists ten actions and events that she asserts is evidence of SPHS's persistent and significant mistreatment. Notwithstanding the number of incidents on which she relies, no reasonable factfinder could find Jenkins has satisfied the severe or pervasive element. Tellingly, Jenkins cited no case law in support of her contention that these ten actions either taken separately or together rise to the level of creating a change in the terms of her employment. Instead, the Court's research yields a different result. Names like "honey" or "kiddo" are not objectively severe. *Tourtellotte v. Eli Lilly & Co.*, Civ. A. No. 09-774, 2013 WL 1628603, at *7 (E.D. Pa. Apr. 16, 2013) (finding "Barbie Doll" or "honey" is not so severe or pervasive enough to satisfy this element); *Vroman v. A. Crivelli Buick Pontiac GMC, Inc.*, Civ. A. No. 08-192, 2010 WL 1052951 (W.D. Pa. Mar. 22, 2010).

Certainly, the record  evidence also reveals that Jenkins was berated by the COO and severely bullied by a subordinate, but there is absolutely no evidence that it was gender related. *See Smith v. Sec'y United States Navy*, 843 F. App'x 466, 471 (3d Cir. 2021)). Moreover, Jackson, the subordinate, was the person who assigned clerical work to Jenkins and arranged her schedule to exclude her from meetings; there is no evidence that management was aware of these actions and failed to take appropriate action. *See Smith*, 843 F. App'x at 471("[a]n employer is liable for a hostile environment created by non-supervisory employees only if the employer failed to provide a reasonable avenue for complaint, or the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action"). Similarly, there is no indication that being asked to move out her office, being denied new office furniture, or being required to see additional patients had any connection to her gender as opposed to her employment status as a PA-

C. Without more, this does not rise to the level of severe or pervasive. *See Stremple v. Nicholson*, Civ. A. No. 01-890, 2006 WL 1744316, *4 (W.D. Pa. Jun. 22, 2006) (citations and internal quotations omitted).  For these reasons, summary judgment is also warranted on this claim.

G.     Constructive Discharge

In her responsive brief, Jenkins appears to attempt to assert a claim for constructive discharge under Pennsylvania law.  (ECF No. 42 at 8-9.)  Her Amended Complaint, which is the operative pleading, does not include such a claim, however.  At no time did Jenkins seek to further amend her complaint in order to include such a claim, nor does she present any argument to support a conclusion that any such claim has actually been asserted.  (ECF No. 25.)  Therefore, Jenkins is precluded from asserting such a claim.

To the extent that Jenkins is attempting to use the concept of constructive discharge as a basis for suggesting that she sustained an adverse action as to any of her federal claims premised on discrimination, she has failed to meet her burden to demonstrate SPHS's actions were pretextual, as already discussed.  *Hair v. Fayette Cty. of Pa.*, 265 F. Supp. 3d 544, 566 (W.D. Pa. 2017).  *Cichonke v. Twp.*, Civ. A. No. 14-4243, 2015 WL 8764744, at *22 (E.D. Pa. Dec. 14, 2015); *Mohl v. Cty. of Lebanon*, Civ. A. No. 1:2-cv- 0019, 2014 WL 12891990, at *5 (M.D. Pa. Oct. 22, 2014).  Accordingly, summary judgment is warranted.

**V.     Conclusion**

For these reasons, summary judgment will be granted in favor of SPHS and against Jenkins on all claims asserted in this action.

An appropriate order will follow.

BY THE COURT:


Dated: December 17, 2021

s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge